# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 21-547V

|  |  |
|---|---|
| ANNA DAVIS,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: July 15, 2025 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC,* for Respondent.

**DECISION**[1]

On January 11, 2021, Anna Davis filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table injury - that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on October 31, 2018. Petition at 1. The case was assigned to the Special Processing Unit of

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

the Office of Special Masters (the "SPU") after it was activated from pre-assignment review.

After a full review of the evidence, and for the reasons discussed below, I find that Petitioner has not established by a preponderance of the evidence that she experienced the residual effects of her injury for more than six months (the Act's "severity requirement"), and therefore she is not entitled to damages, and the claim must be dismissed.

## I.   Relevant Procedural History

Over a year after the case was activated and assigned to SPU, Respondent determined that he would defend the case, and thereafter filed his Rule 4(c) Report on June 12, 2023. ECF No. 27. Respondent argues that Petitioner has failed to demonstrate that she "suffered the residual effects or complications" of her alleged SIRVA injury "for more than 6 months after the administration of [her flu] vaccine" as required under Section 11(c)(1)(D)(i) of the Act. ECF No. 27 at 5-6.

I subsequently set deadlines for the filing of briefs addressing this contested issue (as well as Petitioner's success in meeting the other SIRVA elements). Non-PDF Order filed June 28, 2023. I further ordered Petitioner to file any additional evidence in support of her claim. *Id.* On August 14, 2023, Petitioner filed a Motion for a Ruling on the Record Regarding Entitlement. ECF No. 28. In her brief, Petitioner argued that she has demonstrated that she suffered the residual effects of her injury for at least six months and otherwise established entitlement to compensation for a Table SIRVA injury. ECF No. 28 at 5-7. Respondent reacted to Petitioner's brief on August 28, 2023, maintaining that Petitioner has failed to meet the Act's severity requirement and therefore her claim must be dismissed. ECF No. 29.

## II.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for his injury. Section 11(c)(1)(A)(B)(D)(E).

3

is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

III.  **Findings of Fact and Analysis**

I have fully reviewed the evidence, including all medical records and affidavits, and the parties' briefing. I find most relevant the following:

- On October 31, 2018, Petitioner received a flu vaccine in her left shoulder at CVS Pharmacy. Ex. 3 at 3.

- On November 14, 2018, two weeks after her vaccination, Petitioner was seen by Joseph Yu, MD, at Total Sports Medicine, for left shoulder pain. Ex. 4 at 22. Specifically, Petitioner complained of

    > left shoulder pain for the past 2 weeks. Pain was felt after a flu vaccination. She felt the nurse gave the injection wrong because pain was felt immediately and sharp and has not gone away. She has intense soreness with hand ting[ling]. No pain[] medications are required, no MRI has been performed[.] The pain is over the lateral aspect of the shoulder and worse with elevation.

    *Id.* On examination, Petitioner's left shoulder was found to "elevate[] actively" to 140°, her external rotation was 60°, and her internal rotation was to "L1 with pain." *Id.* Her left shoulder strength was found to be "near full" and she had pain with abduction. *Id.* She was assessed with "[a]cute pain of left shoulder" which Dr. Yu stated was "[m]ost likely, . . . related to the injection." *Id.* Dr. Yu stated that Petitioner could have a "small muscle injury or perhaps more uncommonly, [a] rotator cuff injury." *Id.* Dr. Yu recommended Petitioner undergo an MRI if her pain persisted for two to four more weeks. *Id.*

- After a two-month gap in treatment, Petitioner underwent an MRI on January 15, 2019. Ex. 5 at 7. The MRI history noted that Petitioner had "left shoulder pain and numbness since flu shot October 10, 2018." *Id.* The MRI Impression was

    > 1. Teres minor rotator cuff tendinitis with acute edema in the insertion of the cuff tendon. No definite fluid filled disruption.
    > 2. Focal subdeltoid bursitis adjacent to the insertion of the teres minor.
    > 3. Focal osteitis with moderate hyperintense subcortical bone marrow edema deep to the insertion of the teres minor tendon.
    > 4. The above findings may be related to acute trauma, acute

5

> inflammation, or possibly acute infection. Recommend correlation with clinical and laboratory findings.

*Id.*

- On January 23, 2019, Petitioner was seen Dr. Yu in follow-up to her MRI. Ex. 4 at 21. The record provides that Petitioner "recently had a traumatic flu vaccination." *Id.* On examination of her left shoulder, Dr. Yu stated that there was "tenderness to palpation over the lateral aspect of the shoulder" and while Petitioner was "near full strength" she still exhibited "pain with abduction." *Id.* Petitioner's range of motion was improved from her prior visit, as she "elevate[d] actively to 150°", while her external rotation remained at 60°, and her internal rotation was to "T8 with less pain." *Id.* Dr. Yu continued to assess Petitioner with "[a]cute pain of left shoulder," but stated that her should was "*feeling better at this point in time*. If she wants, we will get an MRI 6 months from now to make sure the bone edema goes away." *Id.* (emphasis added).

- There is a subsequent four and one-half months long treatment gap. On June 5, 2019, Petitioner was seen at the Emergency Department of Mountain View Hospital with a chief complaint of a "[c]at bite." Ex. 6 at 87. Petitioner reported she returned home to her "dog attacking [her] cat" and when she intervened the cat "then bit and scratched her multiple times to both hands/wrists, and left ankle area." *Id.* Petitioner stated she was unsure of the cat's vaccination status and she "denie[d] other symptoms or injuries." *Id.* An upper extremity musculoskeletal examination found that Petitioner had "[f]ull range of motion, [n]o swelling, . . . no compartment syndrome." *Id.* at 90. The exam notes document "[m]ultiple superficial abrasions and superficial punctures" to Petitioner's bilateral fingers, hands, and wrists. *Id.* The record contains no mention of left shoulder pain or left shoulder limitations. Petitioner's wounds were cleaned and dressed with "topical antibiotic ointment", and Petitioner was discharged. *Id.* at 90-92.

- On June 6, 2019, Petitioner returned to the Emergency Department as she observed increased redness around the scratches and bites from her cat. Ex. 6 at 40, 45. Petitioner injuries were treated, she received medications, and was advised to follow-up with hand surgery. *Id.* at 45.

- On August 14, 2019 (and after a second, more than two month-long gap), Petitioner had a follow-up appointment with Dr. Yu for her left shoulder. Ex. 4 at 20. Dr. Yu's history states:

  > This patient returns today for evaluation and treatment of left shoulder. Her shoulder was *previously* injured by a needle that went

6

too far inside the shoulder. *In the last 2 months*, she has developed pain which wakes her up at night. She has pain with movement of the shoulder. There is no history of injury.

*Id.* (emphasis added). On examination, Petitioner's left shoulder range of motion was now reduced to an elevation of 120°, external rotation of 45° and her internal rotation was to L5. Her strength was noted to be "difficult to assess secondary to pain." *Id.* Dr. Yu assessed Petitioner with left shoulder pain of "unspecified chronicity" and planned to order an MRI to look at the increased signal around the teres minor" (that Dr. Yu noted under a review of her "Imaging Studies" was on her prior MRI and was "also present at the bone insertion"). *Id.*

- On September 25, 2019, Petitioner underwent another MRI exam – which was compared to the results from her prior exam of January 15, 2019. Ex. 5 at 4. The impression stated:

    1. There is a type 2 downward sloping acromium.
    2. The tendinitis described involving the teres minor tendon on prior study has resolved.
    3. Minimal fluid within the subacromial/subdeltoid bursa.
    4. Fluid signal partially surrounding the long biceps tendon, nonspecific but can be seen with tenosynovitis.

    *Id.*

- On October 4, 2019, Petitioner was seen again by Dr. Yu to review her MRI from September 25, 2019. Ex. 4 at 19. Dr. Yu noted that Petitioner's recent MRI revealed a "decreased signal around the teres minor" and "some fluid around the biceps tendon." *Id.* Petitioner's left shoulder exam findings were unchanged from her August 14, 2019 exam. *Id.* Dr. Yu assessed Petitioner with "[a]dhesive capsulitis" and referred her to physical therapy "for active and passive range of motion exercises." *Id.*

- On October 9, 2019, Petitioner was seen for an initial evaluation for physical therapy. Ex. 4 at 69. The "[s]ubjective" report of her current condition detailed a chief complaint of "p[ain] in the L[eft] shoulder, difficulty sleeping, weakness, decreased L[eft] shoulder ROM, and impaired ability to perform IADLS [or instrumental activities of daily living]." *Id.* An onset date of October 9, 2019 (the date of the appointment) was provided and in regard to her "Specific Injury" Petitioner reported that she "received a flu shot on the supraspinatus insertion last

7

October (2018) and since then her shoulder began to lose ROM and became weaker." *Id.*

- Thereafter, Petitioner continued to treat her left shoulder through at least January 2020. Ex. 4 at 39-40.

## ANALYSIS

At issue in this case is whether Petitioner has satisfied the Vaccine Act's "severity requirement," pursuant to which a petitioner demonstrate that they:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). To do so here, Petitioner would need to establish sequelae from her alleged SIRVA at least through the end of April 2019 (assuming an onset of October 31, 2018).

After a careful review of the record, I find that Petitioner has not established severity. Petitioner first sought care for left shoulder pain with Dr. Yu two weeks after her flu vaccination on November 14, 2018. Ex. 4 at 22. Thereafter, she underwent an MRI approximately two months later on January 15, 2019, and followed up with Dr. Yu on January 23, 2019. Ex. 5 at 7; Ex. 4 at 21.

At her second visit with Dr. Yu on January 23, 2019, while Petitioner continued to have some symptoms of shoulder pain and restriction, she reported that she was "*feeling better at this point in time*." Ex. 4 at 21 (emphasis added). Additionally, at the January 23rd visit her ROM had improved from her first visit with Dr. Yu two weeks after her vaccination. Ex. 4 at 21-22. Thereafter, Petitioner sought no further care for her shoulder until August 14, 2019.

Accordingly, Petitioner sought very limited treatment for her shoulder for *less than three months* (84 days) following her vaccination. She thereafter reported improvement, displayed no clinical signs of ROM limits, and sought no further shoulder treatment for nearly *seven months*, or 202 days. Ex. at 20-21. This fact pattern does not establish severity.

Petitioner argues that the medical records demonstrate that she remained symptomatic at her January 23, 2019 visit with Dr. Yu (prior to her gap in seeking treatment for her shoulder) and that her return visit to Dr. Yu on August 14, 2019 was noted to be a "f/u" visit regarding her left shoulder. Petitioner further argues that her symptoms and limitations in range of motion remained the same between the two visits with Dr. Yu – suggesting they were from the same injury. ECF No. 28 at 6-7 (citations omitted).

While I agree that Petitioner's symptoms were not *entirely* resolved at the time of her January 2019 visit with Dr. Yu, that does not also mean that her symptoms persisted for an additional 202 days. And while Petitioner suffered "tenderness to palpitation" of the shoulder at both her January and August 2019 appointments, her other exam findings had changed. Ex. 4 at 20-21. As Respondent points out, when Petitioner saw Dr. Yu again on August 14, 2019, her range of motion deficits and strength testing were not the same as they had been prior to her approximate seven-month gap in treatment. ECF No. 29 at 4-5. Specifically, Petitioner's January 23, 2019 range of motion was noted to be "elevate[d] actively to 150°", while her external rotation was 60°, and her internal rotation was to T8. Ex. 4 at 21. However, on August 14, 2019 her elevation was reduced to 120°, her external rotation was now 45°, and her internal rotation was to L5. Ex. 4 at 20. Further, on January 23, 2019, Petitioner's strength testing revealed that she was "near full strength" and had "pain with abduction." Ex. 4 at 21. But by August 14, 2019, Dr. Yu stated that Petitioner's "strength [wa]s difficult to assess secondary to pain" – implying a significant increase in pain as compared to her prior visit before her gap in treatment, when she was found to have "near full strength." Ex. 4 at 20-21.

Additionally, while the reason for Petitioner's August 2019 appointment with Dr. Yu is described as "f/u L[ef]t shoulder" and her history appropriately details that she was "*previously* injured by a needle that went too far inside the shoulder", the record goes on to state "*[i]n the last two months, she has developed pain* which wakes her up at night" - implying something new had developed in the prior two months. *Id.* at 20 (emphasis added). Petitioner was assessed with left shoulder pain of "unspecified chronicity" and Dr. Yu no longer linked his assessment to Petitioner's vaccination. *Id.*

Additionally, Petitioner's MRI reports before and after her treatment gap differ. Petitioner's MRI report in January 2019 revealed rotator cuff tendinitis "with acute edema in the insertion of the cuff tendon," bursitis, and "focal osteitis with moderate hyperintense subcortical bone marrow edema deep to the insertion of the teres minor tendon." Ex. 5 at 7. However, Petitioner's September 2019 MRI revealed "a type 2 downward sloping acromium," "minimal fluid within the subacromial/subdeltoid bursa," and a "[f]luid signal partially surrounding the long biceps tendon" which was noted to be nonspecific, "but can be seen with tenosynovitis." Ex. 5 at 4. Additionally, her second MRI results suggested

9

that the tendinitis seen on her prior MRI had resolved, her rotator cuff muscles and tendons were normal, and "her marrow signal was unremarkable." *Id.*[4] Finally, as Respondent notes in his brief, when Petitioner saw Dr. Yu on October 4, 2019 in follow-up to her second MRI, he assessed her with a new diagnosis – adhesive capsulitis of the left shoulder. ECF No. 29 at 5; Ex. 4 at 19.

In some cases, I have found the severity requirement met where a petitioner has received a steroid injection shortly before the six-month mark but then does not seek care for several months thereafter – suggesting no need for care until the ameliorative effects of this treatment have worn off. *See, e.g.*, *Sawyer v. Sec'y of Health & Human Servs.*, No. 19-1473V, 2023 WL 4505208, at *5 (Fed. Cl. Spec. Mstr. June 12, 2023) (finding severity requirement met where the petitioner had a four month gap in treatment after a steroid injection, then returned to care reporting a *return* of her SIRVA-related pain after vigorous cleaning); *Cross v. Sec'y of Health & Human Servs.*, No. 19-1958V, 2023 WL 120783, at *5-6 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding severity requirement met where the petitioner received a steroid injection and then did not seek care again for six months, stating that the "six-month gap in Petitioner's treatment for her shoulder is at least partially explained by the fact that she received a cortisone injection on October 22, 2018, for her shoulder pain, which subsequently provided significant relief for a period of time").

But Ms. Davis's situation is not comparable. Of note, in this case Petitioner did not receive a steroid injection or other pain alleviating treatment that would explain a temporary relief in her shoulder pain, and therefore a subsequent gap in treatment. In this case, the records do not show any documented symptoms for *nearly seven months* after her January 23, 2019 appointment with Dr. Yu – at which time she had reported to Dr. Yu that she was feeling better. Ex. 4 at 21. Dr. Yu recommended no further treatment other than a possible repeat MRI after six months, *if desired*, "to make sure the bone edema goes away" – presumptively because at that time, Petitioner was largely recovered albeit with some residual symptoms. Ex. 4 at 21. And when Petitioner was evaluated after her

---

[4] Petitioner also argues that her initial physical therapy in evaluation October 2019 (approximately one year after her flu vaccination) describes her "specific injury" as a flu shot in 2018. ECF No. 28 at 7 (citing Ex. 4 at 69). However, I note that Petitioner's physical therapy notation regarding her "specific injury" is contained within the "Subjective" portion of that record – apparently based upon Petitioner's *own report* that she "received a flu shot on the supraspinatus insertion last October (2018) and since then her shoulder began to lose ROM and became weaker." Ex. 4 at 69. This same section of the record provides "Onset Date: 10/9/2019" (which was the date of the physical therapy evaluation itself), and states "Type of Injury: New injury." *Id.* These internal inconsistencies within the record's subjective reporting render it difficult to rely upon in support of either party's position.

gap in treatment, as discussed above, her physical exam and MRI findings had changed, and she was assessed with a new diagnosis.[5]

Additionally, Petitioner has offered no testimony through a sworn declaration or affidavit addressing her gap in treatment, or the alleged continuity of her shoulder pain following her vaccination. In fact, the only declaration offered by Petitioner fails to address the duration or sequela of her alleged injury at all. Ex. 1. Petitioner was offered an opportunity to file any additional evidence in support of her claim, but filed only her Motion for a Ruling on Entitlement. Scheduling Order (Non-PDF) issued June 28, 2023; ECF No. 28. In many cases, I have credited persuasive witness testimony as offering a credible explanation for lengthy gaps in treatment, but that has not been provided here.

## Conclusion

**Based on the entire record, I find that Petitioner has failed to establish that the statutory severity requirement is satisfied. Accordingly, this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.**[6]

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[5] Additionally, I observe that Petitioner was seen at the emergency room on June 5 and 6, 2019, for cat bites and scratches to her hands and wrists. At that time an upper extremity musculoskeletal examination found that Petitioner had "[f]ull range of motion," and Petitioner reported no shoulder pain. Ex. 6 at 87, 90, 45.

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.